14 N.J. Super. 121 (1951)
81 A.2d 406
GUSSIE BLUT, AS EXECUTRIX UNDER THE LAST WILL AND TESTAMENT OF ISAAC BLUT, DECEASED, PLAINTIFF,
v.
BENJAMIN KATZ AND HERMAN MARKS, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 24, 1951.
*123 Messrs. Marcus & Levy, attorneys for plaintiff.
Mr. Peter Cohn, attorney for defendant Benjamin Katz.
Mr. Abram Waks, attorney for defendant Herman Marks.
GRIMSHAW, J.S.C.
This is a suit for the dissolution of a partnership and an accounting of the profits, brought by the executrix of a deceased partner against his surviving associates. There is a counterclaim in which the surviving partners seek to charge the account of the deceased partner with the cost of providing substitute help during his sickness.
The issues as limited and defined by the pretrial order are:
"1. The first issue is whether the partnership between the plaintiff's decedent and the defendants was based upon a written agreement dated January 7, 1925, or upon an oral agreement among the parties made some time thereafter, it being conceded that the interest of the decedent of the partnership was a 1/3 interest.
2. The second issue is whether there shall be a charge against the decedent for the cost of hiring help to do the work which, as a result of illness, he was unable to do.
3. The third issue is whether the decedent, until the time of his death, received his full proportionate share of the profits of the company."
I find the facts to be as follows:
On January 7, 1925, Herman Marks, Philip Pushinsky, Isaac Blut, Benjamin Katz and Isador Abrams executed an agreement of partnership under the terms of which they engaged to conduct a business as the United Shop Cap Company. The partnership agreement was for a term of one year. Among other provisions it contained the following clauses:
*124 "It is agreed by and between the parties hereto, that at all times during the continuance of their copartnership they and each of them will give their attendance, their and each of their best endeavors, and to the utmost of their skill, exert themselves for their joint interest, benefit, profit, and advantage, and truly emply (sic), buy, sell, in the business aforesaid, and also that they shall and will at all times during the said copartnership, bear, pay and discharge equally between them all rents, and other expenses, that may be required for the support, and management of the said business, that all gains, profits, and increases, that shall come, grow or arise from or by means of their said business, shall be divided between them 1/5 share to each, and all loss that shall happen to their business by ill commodities, bad debts or otherwise, shall be borne and paid between them, 1/5 each."
And further:
"It is further agreed that during the continuance of said copartnership, the parties hereto shall mutually agree upon a weekly allowance to be paid to each of the parties hereto for services to be rendered and said allowance shall be charged as an item of expense of the copartnership business.
It is further agreed that upon the completion of said copartnership, any one of the partners desiring to withdraw from the business shall be entitled to receive as his share, the reasonable market value of the stock, fixtures and all assets that may be ascertained, but shall not be entitled to any money for good will."
The business was operated by the five partners until about 1940 when Abrams and Pushinsky withdrew and received their share of the business from the other partners in accordance with the provisions of the partnership agreement. Thereafter the business was operated by Marks, Katz and Blut, the remaining partners, each having a one-third interest.
The business prospered. Each partner withdrew weekly the sum of $95. From time to time further sums were withdrawn. As to the additional withdrawals the practice was for the accountant to make monthly reports on the status of the company. The partners would then determine the amount of cash which might be withdrawn from the company funds with safety. A check for that amount would be cashed and divided, each partner receiving one-third. Between January 15 and March 15 of each year, the accountant would prepare the annual financial statement. This he *125 would discuss with each of the partners individually, having particular reference to the withdrawals of the respective partners. Upon receiving their approval of the report, the accountant would prepare the income tax returns.
Blut, plaintiff's decedent, became ill in the spring of 1946, and, thereafter, until his death on October 28, 1949, did not render any service to the partnership business. He did, however, continue to receive the weekly payment of $95 and his share of the other withdrawals.
After Blut's death, his widow, as executrix, instituted this action. Her right to an accounting cannot be disputed. But that accounting need not go further back than January, 1949, when, according to the undisputed testimony of the accountant, Blut was shown and approved of the statement for the year 1948. Blut had, at all times, free access to the books of the business and had complete information as to its operations. He was shown and gave his assent to the financial reports. Under such circumstances and in the absence of a clear and convincing showing of fraud or mistake, the accounting need only be from the last accounting period. Dobbins v. Tatem, 25 A. 544 (Ch. 1892), not reported in the State Reports; Summerill v. Summerill, 83 N.J. Eq. 3 (Ch. 1913), affirmed 83 N.J. Eq. 350 (E. & A. 1914).
In an amended complaint, plaintiff charged that Blut failed to receive the withdrawals charged against him in 1946 and 1947. The evidence offered in support of this charge was not impressive. Bank records were produced which tended to the establishment of the fact that all of Blut's withdrawals did not find their way into his bank account. But defendants both testified that Blut frequently took a portion of his earnings in cash. And even Mrs. Blut conceded that he frequently brought home substantial amounts of cash. Such testimony, in my opinion, failed to overcome the positive testimony of the accountant that Blut was shown and approved of the yearly accounting reports.
*126 Defendants, by way of counterclaim, sought to charge against Blut's interest, the cost of providing substitutes to do his work during the period of his illness from 1946 until his death. There is support for the proposition that where a partner agrees to devote his time and energy to the partnership business and is prevented by sickness from fulfilling that contract, the cost of providing substitutes may be charged against him. However, that rule has no application here. From 1946 to the date of his death, defendants paid to Blut his full share of the partnership earnings. As he did, they also received and approved the yearly reports in which no charge was made against Blut's account for the cost of hiring others to do his work. By their conduct they have waived any right to make such a charge at this time.
Returning, then, to the issues outlined by the pretrial order, I am of the opinion that aside from the fact that the partnership was one at will, the rights and duties of the partners remained the same as they were under the contract of January 7, 1925. R.S. 42:1-23. I am further of the opinion that no charge should be made against Blut's interest in the partnership for the cost of hiring others to do his work. And finally, the evidence establishes the fact that Blut received his full share of the partnership earnings.
It was conceded that the books show that Blut's interest in the capital account at the time of his death was $19,153. There will be judgment for that amount, with interest from October 28, 1949, in favor of the plaintiff.